ORAL ARGUMENT NOT YET SCHEDULED

Case No. 23-1157
(and consolidated cases)

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

STATE OF UTAH, ET AL.,

Petitioners,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

Respondents.

_____

On Petitions for Review of Final Action
by the United States Environmental Protection Agency

_____

**RESPONDENT EPA'S OPPOSITION TO MOTION TO STAY FINAL RULE**
_____

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division

Of Counsel:

DANIEL SCHRAMM
HALI KERR
JEANHEE HONG
Office of General Counsel
U.S. Environmental
    Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

CHLOE H. KOLMAN
ELISABETH H. CARTER
ZOE PALENIK
U.S. Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
(202) 514-9277
chloe.kolman@usdoj.gov

September 22, 2023

# TABLE OF CONTENTS

Glossary ......................................................................................................... v

INTRODUCTION ........................................................................................... 1

BACKGROUND ............................................................................................. 3

STANDARD OF REVIEW ............................................................................. 3

ARGUMENT .................................................................................................. 3

I.      Petitioner is unlikely to succeed on the merits ................................... 3

        A.      EPA reasonably concluded that regulation of iron and steel mills is
                warranted ................................................................................. 3

        B.      The Rule is procedurally proper .............................................. 6

                1.      Petitioner's notice arguments are barred .................... 6

                2.      Petitioner's notice arguments otherwise fail............... 7

                        a.      Modeling ........................................................ 8

                        b.      Reheat Furnaces ............................................ 9

                        c.      Boilers .......................................................... 10

        C.      The Rule's test-and-set approach for reheat furnaces is consistent with
                the Clean Air Act and the record ........................................ 10

        D.      Judicial orders in other cases partially staying the Disapproval Action
                pending judicial review have no bearing on the merits of this case ... 13

        E.      The Rule is consistent with the Clean Air Act and principles of
                cooperative federalism ........................................................ 15

II.     Petitioner will not suffer irreparable harm absent a stay ................. 17

III.    Balancing the equities disfavors a stay ............................................ 20

CONCLUSION ............................................................................................ 23

i

# TABLE OF AUTHORITIES

## CASES

*Ashland Oil, Inc v. FTC*,
  409 F. Supp. 297 (D.D.C.),
  *aff'd,* 548 F.2d 977 (D.C. Cir. 1976) ..................................................................17

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ...............................................................19

*CSX Transp., Inc. v. Surface Transp. Bd.*,
  584 F.3d 1076 (D.C. Cir. 2009) ........................................................7, 8

*Cuomo v. NRC*,
  772 F.2d 972 (D.C. Cir. 1985) ....................................................................3

*EME Homer City Gen., L.P. v. EPA*,
  795 F.3d 118 (D.C. Cir. 2015) .................................................................6

*EPA v. EME Homer City Gen., L.P.*,
  572 U.S. 489 (2014) ............................................................1, 16, 21, 23

*Mexichem Specialty Resins, Inc. v. EPA*,
  787 F.3d 544 (D.C. Cir. 2015) .................................................................6

*Michigan v. EPA*,
  213 F.3d 663 (D.C. Cir. 2000) ...............................................................21

*Nken v. Holder*,
  556 U.S. 418 (2009) ...........................................................................3, 20

*North Carolina v. EPA*,
  531 F.3d 896 (D.C. Cir. 2008) ...............................................................15

*Nw. Airlines, Inc. v. Goldschmidt*,
  645 F.2d 1309 (8th Cir. 1981) ..................................................................8

*Small Refiner Lead Phase-Down Task Force v. EPA*,
  705 F.2d 506 (D.C. Cir. 1983) ..................................................................7

*Solite Corp. v. EPA*,
    952 F.2d 473 (D.C. Cir. 1991) ................................................................8

*Wisconsin v. EPA*,
    938 F.3d 303 (D.C. Cir. 2019) ...........................................6, 15, 16, 21

*Wis. Gas. Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ..............................................................17

**STATUTES**

5 U.S.C. § 706(2) ..................................................................................8

42 U.S.C. § 7410(a)(2)(D)(i)(I) ............................................................1

42 U.S.C. § 7410(c)(1) ........................................................................16

42 U.S.C. § 7607(d) .............................................................................11

42 U.S.C. § 7607(d)(7)(B) ................................................6, 10, 11, 14

42 U.S.C. § 7607(d)(9)(D) ....................................................................7

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. § 52.40(e) ...........................................................................13

40 C.F.R. § 52.43 ................................................................................11

40 C.F.R. § 52.43(c) ...........................................................................11

40 C.F.R. § 52.43(d) ...........................................................................12

40 C.F.R. § 52.43(d)(1) .......................................................................19

40 C.F.R. § 52.43(d)(4) .......................................................................12

40 C.F.R. § 60.44b(f) ..........................................................................12

40 C.F.R. Pt. 78 ................................................................................12

40 C.F.R. § 97.508 ....................................................................11, 12

40 C.F.R. § 97.535 ............................................................................12

**FEDERAL REGISTER**

81 Fed. Reg. 21672 (Apr. 12, 2016) ...............................................11

87 Fed. Reg. 20036 (Apr. 6, 2022) .........................................8, 9, 10, 12

88 Fed. Reg. 36654 (June 5, 2023) ................................. 1, 4, 5, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 20, 21, 22

88 Fed. Reg. 54998 (Aug. 14, 2023).................................................9

**LOCAL RULES**

D.C. Cir. R. 18(a)(1) .........................................................................3

# GLOSSARY

| | |
|---|---|
| EPA | U.S. Environmental Protection Agency |
| Good Neighbor Plan or Rule | "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards," 88 Fed. Reg. 36654 (June 5, 2023) |
| Good Neighbor Provision | 42 U.S.C. § 7410(a)(2)(D)(i)(I) |
| Non-EGU | Industrial source other than a power plant |
| RTC | Response to Comments |

## INTRODUCTION

Petitioner United States Steel Corporation ("U.S. Steel") seeks a stay, as to the iron and steel industry, of the U.S. Environmental Protection Agency's ("EPA") rule entitled "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards," 88 Fed. Reg. 36654 (June 5, 2023) ("Good Neighbor Plan" or "Rule"). The Rule addresses cross-state ozone pollution, as required by the Clean Air Act's Good Neighbor Provision, 42 U.S.C. § 7410(a)(2)(D)(i)(I). The Good Neighbor Provision ensures that sources in upwind states do their fair share to reduce emissions that contribute to unhealthy air in downwind states. *See EPA v. EME Homer City Gen., L.P.*, 572 U.S. 489, 497 (2014). When developing a federal plan, EPA must identify and eliminate the emissions from upwind states that significantly contribute to downwind states' inability to attain and maintain air quality standards. In the Rule, some of those reductions come from reheat furnaces and boilers in the iron and steel industry.

Petitioner cannot justify its request for a stay as to sources in the iron and steel industry. In large part, Petitioner rehashes arguments advanced by six other groups of Petitioners whose stay motions are fully briefed and whose arguments are incorrect for the reasons set forth in EPA's response brief. *See* ECF 2013255 ("Stay Opposition"). But Petitioner's new arguments similarly fail to justify a stay.

1

First, Petitioner fails to show that it will succeed on the merits. Petitioner repeats arguments EPA has already disproven regarding implementation of the Rule, cooperative federalism, and EPA's analysis of industrial stationary sources ("non-EGUs"). Petitioner's new arguments regarding EPA's modeling and its adoption of a test-and-set approach for reheat furnaces fare no better: many of these arguments are barred under the Act. Further, EPA complied with the Act, and the test-and-set approach is permissible and supported by the record.

Second, Petitioner will not suffer irreparable harm absent a stay. Like other regulated non-EGUs, the iron and steel industry is not required to reduce its emissions until 2026. While Petitioner nonetheless speculates that it will suffer harm in the interim from compliance costs, it balks at identifying with specificity any imminent expenditures required by the Rule. Indeed, Petitioner has not established that it must incur large capital outlays during judicial review.

Third, a stay thwarts the public interest and Congress's directive that EPA tackle upwind emissions contributing to poor air quality in downwind communities. A delay to EPA's efforts to control ozone pollution will force downwind states to shoulder additional regulatory burdens and downwind residents to accept unhealthy air quality. Petitioner's position—that the iron and steel industry need not reduce its emissions *at all*—leaves other industries, regulators, and the public holding the bag.

For the reasons set forth below, the "extraordinary" remedy of a stay is not warranted.

## BACKGROUND

EPA incorporates by reference its description of the background underlying this case in its Stay Opposition.

## STANDARD OF REVIEW

 "On a motion for stay, it is the movant's obligation to justify the court's exercise of such an extraordinary remedy." *Cuomo v. NRC*, 772 F.2d 972, 978 (D.C. Cir. 1985). A movant must demonstrate: (1) likelihood of success on the merits; (2) irreparable injury if relief is withheld; (3) lack of harm to other parties from a stay; and (4) that a stay would serve the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009); *see also* D.C. Cir. R. 18(a)(1).

## ARGUMENT

## I.     Petitioner is unlikely to succeed on the merits.

### A. EPA reasonably concluded that regulation of iron and steel mills is warranted.

When determining what non-EGU industries should be included in the Rule, EPA developed a screening mechanism (the "Screening Assessment") as one step in its decision-making process. Petitioner's argument misunderstands the purpose of the Screening Assessment and repeats claims that EPA has already disproven, *see* Stay Opposition at 33-38. As EPA explained, EPA developed and used the

3

Screening Assessment to identify high-emitting industries for further evaluation to determine whether emissions from those industries could constitute "significant contribution."[1]  Screening Assessment 7-8; RTC 104; Stay Opposition at 8-10. EPA was clear "that the results of the Screening Assessment should not be confused with regulatory requirements, applicability determinations, or emissions limits," and departures in the Rule from the initial results of the Screening Assessment "do not undermine [its] antecedent findings . . . that these industries and emissions units warranted evaluation for appropriate, cost-effective emissions control opportunities."  RTC 99.

The Screening Assessment identified iron and steel as one of nine industries with impacts above the applicable air quality thresholds.  Screening Assessment 24, Table A-3.  This is unsurprising, as the iron and steel industry's manufacturing process involves large-scale combustion.  RTC 97-98.  In the Rule, EPA pared back the proposed requirements for iron and steel, in response to industry comments that some of the proposed control technologies were not sufficiently established on an industry-wide basis.  EPA-HQ-OAR-2021-0668-1110 ("Non-EGU TSD") at 34.  But, EPA explained, this neither contradicted EPA's finding that the iron and steel industry is a source of significant contributions nor

---

[1] This opposition, like the Rule, uses "significant contribution" to encompass both the "contribute significantly" and "interfere with maintenance" prongs.

suggested those other emissions sources within the industry could not eventually be cost-effectively controlled.  88 Fed. Reg. at 36827; Non-EGU TSD 34, 37; RTC 128, 697.  That EPA promulgated fewer control requirements for the iron and steel industry than those initially identified reflects that EPA took seriously industry's comments, not that the Screening Assessment was flawed.

Because the Screening Assessment was merely a starting point for EPA's evaluation, not a final determination of which emissions constitute significant contribution, EPA reasonably concluded in the Rule that the Screening Assessment adequately served this limited purpose.  88 Fed. Reg. at 36740-41; RTC 99.[2] Finally, EPA's overcontrol analysis revealed that, even accounting for an updated estimate of the number of sources and emissions reductions from non-EGU industries, the Rule does not result in prohibited overcontrol.  RTC 124. Petitioners have not shown that EPA unreasonably relied on the Screening Assessment in identifying emissions-reduction opportunities for further scrutiny.

---

[2] The "supplemental" screening assessment Petitioner alludes to for one industry, Mot. at 13, was simply the application of the same methodology to municipal waste combustors, which EPA had not initially evaluated using the Screening Assessment.  88 Fed. Reg. at 36734.

## B. The Rule is procedurally proper.

### 1. Petitioner's notice arguments are barred.

Petitioner's "logical outgrowth" arguments are barred.  Under the Clean Air Act, courts may hear objections to EPA rules only if the objections were "raised with reasonable specificity during the period for public comment," and any objection to the notice and comment process itself must first be raised in a petition for administrative reconsideration to EPA before it may be subject to judicial review.  42 U.S.C. § 7607(d)(7)(B); *see also EME Homer City Gen., L.P. v. EPA*, 795 F.3d 118, 137 (D.C. Cir. 2015) (noting that "the only appropriate path for petitioners to raise [an objection to the notice and comment process] is through an initial petition for reconsideration to EPA"); *Wisconsin v. EPA*, 938 F.3d 303, 332 (D.C. Cir. 2019) (administrative exhaustion requirement in § 7607(d)(7)(B) is "strictly enforced"); *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 553 (D.C. Cir. 2015).  If EPA denies a petition for administrative reconsideration raising procedural objections, the petitioner may seek judicial review of that decision, but until then such objections are barred from review.  42 U.S.C. § 7607(d)(7)(B); *see also Wisconsin*, 938 F.3d at 332 ("Objections raised for the first time in a petition for reconsideration must await EPA's action on that petition.").  EPA has not yet acted on the August 4, 2023, petition for

administrative reconsideration that Petitioner cites, Mot. at 15. Accordingly, these claims are not properly before the Court.

### 2. Petitioner's notice arguments otherwise fail.

Even if not barred, Petitioner's notice arguments fail. Petitioner had adequate notice of, and opportunity to comment on, all relevant parts of the Rule, and its arguments to the contrary misapprehend the purpose of the public comment process. Proposed and final actions need not be identical to satisfy the Act's notice requirement. *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 546-47 (D.C. Cir. 1983). Such a requirement "would lead to the absurdity that the agency can learn from the comments on its proposals only at the peril of starting a new procedural round of commentary." *Id.* (quotation omitted). A proposed action provides adequate notice when "interested parties should have anticipated" the changes between proposal and final were possible. *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) (quotations omitted).

Moreover, an EPA action can be reversed on procedural grounds "only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made." 42 U.S.C. § 7607(d)(9)(D) (referring to last sentence of § 7607(d)(8)). Petitioner cannot meet this high bar.

7

### a. Modeling

EPA provided adequate notice regarding the modeling it used to develop the Rule. EPA used the second version of its 2016-based modeling at proposal; EPA incorporated and accounted for comments – including from Petitioner, *see* U.S. Steel Comment letter (EPA-HQ-OAR-2021-0668-0798), pp. 25-32, 59-60; RTC 246-47 – in the third version of the 2016-based modeling used in the Rule. *See* 88 Fed. Reg. at 36673-74. In short, the updated analysis in the Final Rule is a logical outgrowth of the proposed modeling: Petitioner was sufficiently able to – and did – "offer informed criticism and comments" on the modeling, *Nw. Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309, 1320 (8th Cir. 1981) (citation omitted), and it should have anticipated such updates were possible, *CSX*, 584 F.3d at 1080.

Importantly, just as with the second-version modeling used at proposal, the third-version modeling confirmed the existence of linkages at steps 1 and 2 of EPA's 4-step framework for states in which Petitioner has facilities. *Compare* 87 Fed. Reg. 20036, 20071-72 (Apr. 6, 2022) *with* 88 Fed. Reg. at 36709-11; *see also Solite Corp. v. EPA*, 952 F.2d 473, 485 (D.C. Cir. 1991). So not only has Petitioner failed to show that EPA's use of the third-version modeling was error, it also cannot show that it was prejudiced by EPA's use of the updated modeling. *See* 5 U.S.C. § 706(2). Because the third-version modeling did not reach significantly different results than proposed, the cases Petitioner relies on do not

apply. Mot. at 14. Petitioner's citation to EPA's recent proposal for Wyoming proves the point: where the updated modeling produced a new result for a state – as it did for Wyoming – EPA did not finalize the action for that state. *See* 88 Fed. Reg. at 36717. Because the third-version modeling no longer showed linkages for Wyoming, while the second-version modeling had, EPA recently proposed to approve Wyoming's submission. 88 Fed. Reg. 54998 (Aug. 14, 2023). That proposal is clear that EPA is only soliciting comment on the application of the modeling to Wyoming. *Id.*

### b. Reheat Furnaces

Petitioner's notice argument regarding EPA's test-and-set approach for reheat furnaces also lacks merit. The test-and-set approach was a logical outgrowth of the proposed rule. In fact, EPA's adoption of the test-and-set approach for reheat furnaces was in direct response to Petitioner's comments. EPA initially proposed a uniform numerical emissions limit for reheat furnaces based on the anticipated performance of low-$NO_X$ burners. 87 Fed. Reg. at 20145. Commenters, including Petitioner, claimed there was so much variability across reheat furnaces that a unit-specific approach would be more appropriate. *See, e.g.*, U.S. Steel Comment Letter at 91-92. The Rule's test-and-set approach accommodates this feedback by providing a process for the establishment of unit-specific limits following testing to determine what a low-$NO_X$ burner or equivalent

9

low-NO$_X$ technology can achieve at each unit.  *See* 88 Fed. Reg. at 36828.  In fact,

EPA proposed a test-and-set requirement for other iron and steel industry sources

due to variability between units, 87 Fed. Reg. at 20145, and Petitioner commented

on that approach for those sources, U.S. Steel Comment Letter at 106-08.

Petitioner cannot credibly claim a lack of notice that EPA could adopt this

approach.

### c. Boilers

Lastly, Petitioner's contention that the Rule's regulation of boilers by design

capacity was a "significant departure" from its proposal is simply wrong.  EPA

both proposed and finalized applicability provisions for boilers in all industries

based on design capacity.  *See* 87 Fed. Reg. at 20186; 88 Fed. Reg. at 36884.

Petitioner incorrectly cites the proposed applicability criteria for unit types specific

to iron and steel, not boilers.

### C. The Rule's test-and-set approach for reheat furnaces is consistent with the Clean Air Act and the record.

As an initial matter, Petitioner's argument that the Act prohibits a test-and-

set approach in federal plans is barred because it was not raised with "reasonable

specificity" during the comment period.  42 U.S.C. § 7607(d)(7)(B).[3]  Petitioner's

---

[3] In fact, Petitioner previously endorsed in public comments EPA's proposal to set
emissions limits through an adjudicatory process under another federal plan.  *See*
81 Fed. Reg. 21672, 21678-79 (Apr. 12, 2016).

arguments lack merit anyway.  First, Petitioner appears to misunderstand how the

Rule regulates reheat furnaces.  EPA made a final determination of the amount of

emissions constituting "significant contribution" that must be prohibited from these

sources.  *See* 88 Fed. Reg. at 36740.  Accordingly, reheat furnaces lacking low-

$NO_X$ burners must achieve a 40% reduction from prior emissions levels.  *Id.* at

36827-28; 40 C.F.R. § 52.43.  In accordance with Petitioner's comments, EPA did

not translate this requirement into a uniform emissions-rate limit; instead, EPA

provided an administrative process to set that limit on a unit-by-unit basis,

assuming a 40% reduction from baseline is generally achievable.  40 C.F.R.

§ 52.43(c); *see also* 88 Fed. Reg. at 36676 ("The 'amount' of pollution that is

identified for elimination … [is] that amount of emissions that is in excess of the

emissions control strategies the EPA has deemed cost-effective.").

Because EPA's action on a work plan under the Rule is an adjudicatory

process, not the separate promulgation of a new federal plan, it is not subject to the

procedural requirements of 42 U.S.C. § 7607(d) that Petitioner cites, *see* Mot. at

17-18.  EPA routinely includes comparable adjudicatory, application, and appeal

procedures within FIPs and other rules promulgated under 42 U.S.C. § 7607(d).

*See, e.g.*, 40 C.F.R. § 97.508 (providing for appeal of decisions of the

Administrator under the CSAPR NOx Ozone Season Group 1 Trading Program

through an administrative appeal process under 40 C.F.R. Pt. 78); 40 C.F.R.

11

§ 97.535 (providing an administrative petition process for obtaining alternative compliance-assurance requirements); 40 C.F.R. § 60.44b(f) (administrative process for obtaining alternative emissions limit under a new source performance standard).

Contrary to Petitioner's concerns, 40 C.F.R. § 52.43(d) contains several procedural protections, including deadlines for EPA to act, notice requirements, and a requirement for EPA to provide public documentation of the basis for its decision. *See* C.F.R. § 52.43(d)(4). Likewise, any decision by EPA under this provision would be a final action subject to judicial review. *See* Ex. 1, Mathias Decl. ¶ 51. Petitioner's speculation about how EPA would act on work plan applications is premature and not ripe for adjudication.

Further, the Rule's 40% emission-reduction target is supported in the record.[4] EPA reasonably concluded, and Petitioner does not dispute, that low-$NO_X$ burners are established, feasible technologies that effectively reduce $NO_X$ in many types of exhaust. RTC 747-48. This control is already installed at 32 reheat furnaces, 88 Fed. Reg. at 36827, including at least eight in Indiana, where Petitioner's Gary Works facility is located, *id.* at 36828 n.388. EPA reached the

---

[4] It is unclear where Petitioner derives its claim that EPA asserted at proposal that low-$NO_X$ burners could only achieve a 20% emissions reduction in reheat furnaces; the table Petitioner cites does not support that claim. Mot. at 17 (citing 87 Fed. Reg. at 20145, Table VII.C-3).

40% figure by analyzing the range of emissions reductions achieved by low-NO$_X$ burners and other emissions control technologies at reheat furnaces.  Proposal Non-EGU TSD, 31-34, 41, 43.  EPA concluded that low-NO$_X$ burners on reheat furnaces could generally achieve a reduction of 66%, with potential reduction rates as high as 98%.  *Id.*; RTC 747-48.  EPA conservatively set the requirement at 40%, *see* 88 Fed. Reg. at 36828; Non-EGU TSD at 38, and a limit based on an even lesser degree of reduction is available if needed, 40 C.F.R. § 52.40(e).

Petitioner's claim that EPA lacked the data to support regulation of reheat furnaces is unfounded.  EPA acknowledged in the final Rule that it did not yet have sufficient data to support industry-wide controls for several *other* unit types it had proposed regulating.  88 Fed. Reg. at 36827.  But EPA *did* have sufficient information to find that low-NO$_X$ burners are a readily available control technology for reheat furnaces.  *Id.*; RTC 697-98.

> ### D. Judicial orders in other cases partially staying the Disapproval Action pending judicial review have no bearing on the merits of this case.

As EPA has already explained, *see* Stay Opposition at 24-26, the Rule appropriately implements EPA's responsibility to ensure Good Neighbor obligations are met in each state, regardless of the number of states in which the Rule applies.

First, as EPA explained on pages 24-26 of its Stay Opposition, Petitioner can present no claim on the merits that EPA acted arbitrarily and capriciously in enacting a rule whose application in certain states has been temporarily stayed due to *subsequent* judicial orders in separate litigation over the Disapproval Action. Those claims are obviously barred.  *See* 42 U.S.C. § 7607(d)(7)(B).  Even if they were not, it was not arbitrary and capricious for EPA to fail to assume, in finalizing the Rule on March 15, 2023, that its underlying Disapproval Action would subsequently be stayed in certain states.

That the Rule is not being implemented in certain states due to temporary judicial stays of EPA's predicate state-plan disapproval rule (the "Disapproval Action") does not justify a stay of the Rule as to the iron and steel industry.  EPA made clear that even if the Rule were judicially stayed in certain states, it is severable and "can continue to be implemented in any remaining jurisdictions."[5] 88 Fed. Reg. at 36693.  And as EPA has explained, *see* Stay Opposition 25, the Good Neighbor Provision requires each state to eliminate its own significant contribution; the Rule does so by requiring the "most impactful sources in each

---

[5] Petitioner misleadingly cites language it claims represents EPA's "admission" that the Rule must be applied uniformly to be "efficient and equitable."  Mot. at 8, 9 (citing 88 Fed. Reg. at 36691).  The language Petitioner cites is from a section explaining why it is necessary and appropriate for the Rule to apply in Indian Country within states subject to the rule and does not contradict EPA's conclusion that the Rule is severable by state and industry, *see* 88 Fed. Reg. at 36693.

[linked] state . . . to come up to minimum standards of environmental performance . . . ." 88 Fed. Reg. at 36741.  Because each state must eliminate its significant contributions regardless of whether other contributors also bear responsibility, *see Wisconsin*, 938 F.3d at 324-35, the present exclusion of certain states from the Rule does not change remaining states' responsibilities.

EPA remains obligated to eliminate significant contribution in other states where these facilities are located, and the Rule requires appropriate levels of emissions reductions in those states where it is in effect.  *See North Carolina v. EPA*, 531 F.3d 896, 920-21 (D.C. Cir. 2008) (holding EPA must prohibit *each state's* own significant contribution).  In any event, it is entirely speculative that the states where the Disapproval Action is stayed will remain excluded from the Rule.  Petitioner bears the burden to prove a likelihood of success on the merits in *this* case, and it cannot carry that burden by pointing to temporary stays issued by courts that lack venue to hear those cases, *see* Stay Opposition at 24-25.

### E. The Rule is consistent with the Clean Air Act and principles of cooperative federalism.

Petitioner similarly misses the mark with its argument that EPA erred by issuing the Rule shortly after disapproving 21 states' implementation plans.  Mot. at 10-11.  First, Petitioner improperly argues that EPA's Disapproval Action was unlawful.  That argument is barred here.  Petitioner did not challenge the Disapproval Action, and it cannot now collaterally attack the Disapproval Action

15

through a challenge to the Rule. *See Wisconsin*, 938 F.3d at 336 (holding arguments that "depend on the invalidity of the prior [state plan] disapprovals" are an "improper collateral attack" (cleaned up)).

Moreover, as EPA has explained, *see* Stay Opposition at 14-16, EPA complied with the Clean Air Act when it issued the Rule following the Disapproval Action. The Act states that EPA "shall promulgate a Federal implementation plan" whenever it "disapproves a State implementation plan submission in whole or in part." 42 U.S.C. § 7410(c)(1). As the Supreme Court has held, "EPA is not obliged to wait two years [to promulgate a federal plan] or postpone its action even a single day." *EME Homer City*, 572 U.S. at 509; *see also Wisconsin*, 938 F.3d at 318 (when issuing a federal plan for a state, "EPA presumably must . . . bring that State into compliance before upcoming attainment deadlines, even if the outer limit of the statutory timeframe gives EPA more time . . . ."). EPA complied with that mandate by signing the Rule on March 15, 2023, in time for sources like U.S. Steel's to comply by the 2026 ozone season, associated with the 2027 attainment deadline. 88 Fed. Reg. at 36754.

Nothing in this action undercuts the cooperative federalism principles of the Clean Air Act. States were free to amend their plans before EPA issued the Rule, and they are still free to do so now. *See* 88 Fed. Reg. at 36838-43. It is inherent to the Act that when states do not uphold their duty to eliminate significant

contributions or emissions that interfere with attainment in downwind states, EPA must step in: the Act entails a system of cooperative federalism, not exclusive state authority.

Petitioner has not met its burden to show that its arguments are likely to succeed on the merits, and the stay motion should be denied.

## II.    Petitioner will not suffer irreparable harm absent a stay.

To justify a stay, the Rule must injure Petitioner in a manner that is "both certain and great" as well as "actual and not theoretical." *Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Petitioner must also show that "[t]he injury complained of [is] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (quoting *Ashland Oil, Inc v. FTC*, 409 F. Supp. 297, 307 (D.D.C.), *aff'd,* 548 F.2d 977 (D.C. Cir. 1976)). Petitioner cannot make this showing.

To begin, Petitioner offers a conclusory argument that it will be injured by expending costs under a rule that is "without adherence to law." Mot. at 20. This argument fails for the same reasons that Petitioner fails to demonstrate a likelihood of success on the merits, explained *supra* at Argument I.A-E.

As part of that same argument, Petitioner alleges that the compliance timelines in the Rule are insufficient, and thus it "cannot wait" before incurring substantial costs. Mot. at 20. But Petitioner does not differentiate the costs it will

17

allegedly incur in the near term, like work plan design and other preparatory work, from the costs it may later incur from retrofit and installation. *See id.* Nor does Petitioner identify *when* it will allegedly make larger capital expenditures. Instead, the only cost Petitioner identifies with specificity is a capital cost estimate for installation of low-$NO_x$ burners at one facility ($28 – 46 million),[6] *id.*, but Petitioner stops short of alleging that the installation is imminent. Indeed, emissions reduction obligations do not begin until 2026 and, notably, according to Petitioner's timeline, the first order and "procurement" steps will not occur until March and April of 2025 respectively. Mot. Att. A, Att. 1, App'x A ("Estimated Low $NO_X$ Burner Installation Schedule"). Petitioner thus fails to support its argument that it must expend substantial costs *during judicial review*. *See Wis. Gas Co.*, 758 F.2d at 674.

Similarly, although Petitioner alleges that it has already incurred "significant costs," it fails to bolster that allegation with any evidence. Mot. at 20. Such vague allegations cannot satisfy the "high standard for irreparable injury," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In support,

---

[6] Even assuming that Petitioner will spend $28-46 million at some point, which EPA does not concede, EPA notes that figure is small by comparison to U.S. Steel's net sales of over $21 billion last year. United States Steel Corporation, Annual Report (Form 10-K) at 48 (Feb. 3, 2023), available at https://investors.ussteel.com/sec-filings/all-sec-filings/content/0001163302-23-000016/0001163302-23-000016.pdf.

Petitioner's declarant states only that the company has expended "significant costs" to conduct engineering and design work, Piscitelli Decl. ¶ 14, but declines to provide a cost-estimate.  Thus, the Court can have no idea what constitutes a "significant" cost to Petitioner and cannot reasonably assess whether Petitioner asserts a "certain and great" injury.

Regardless of Petitioner's allegation that, at some future point, it will need to expend capital installation costs, the compliance timeline in the Rule is adequate.  The Rule was signed on March 15, 2023, giving industrial sources more than three years to comply.  Mathias Decl. ¶ 11.  The Rule permits extensions of up to three years if operators cannot comply due to circumstances outside of their control.  *Id.* ¶ 50.  For reheat furnaces, the full control-installation timeline (including permitting, equipment design, and installation) is estimated at 9 to 15 months.  Timing Report at 25.  And the work plan for test-and-set is not due until August 5, 2024.  40 C.F.R. § 52.43(d)(1).  Importantly, Petitioner does not argue that compliance on this timeframe is not possible for any specific reason.  Nor does Petitioner's declarant offer more than speculation that vendor and labor shortages will continue and cause unspecified delays.  Piscitelli Decl. ¶¶ 9-10.  EPA carefully considered supply-chain issues in the final Rule and found those issues largely resolving post-pandemic.  88 Fed. Reg. at 36759-60; Mathias Decl. ¶¶ 38–39.

19

In sum, Petitioner has not established that it cannot meet the Rule's schedule, that it must incur capital expenditures during judicial review to comply by the 2026 deadline, or that extensions or alternative limits have been denied to it. Petitioner thus fails to demonstrate irreparable harm.

## III.  Balancing the equities disfavors a stay.

If the Court finds that Petitioner has shown a likelihood of success on the merits and an irreparable injury, it must "assess[] the harm to the opposing party and weigh[] the public interest." *Nken v. Holder*, 556 U.S. at 435.  When the government opposes the stay, "[t]hese factors merge." *Id.*  Here, Petitioner's purported harms cannot outweigh the benefits of the Good Neighbor Plan.

The emissions reductions under the Rule, which include those from the high-emitting iron and steel industry, will provide significant benefits to the public in downwind states.  That the Rule is not being implemented in certain states is immaterial to whether these emissions reductions from the iron and steel industry in remaining states will provide meaningful benefits: ozone exposure can weaken human health, including "premature mortality and certain morbidity effects, such as asthma exacerbation."  88 Fed. Reg. at 36658.  Ozone is similarly harmful to agriculture and local ecosystems as it may "limit[] tree growth, caus[e] foliar injury, and chang[e] ecosystem community composition."  *Id.*  By foisting the burden of air pollution on downwind states, a stay would also cause economic

20

harm by subjecting these states to snowballing regulatory burdens.  Mathias Decl. ¶¶ 19, 57–63.

The emission reductions from the iron and steel industry are part of the Rule's cost-effective strategy for eliminating significant upwind contribution from Indiana and the other states covered by the Rule.  *See EME Homer City*, 572 U.S. at 520.  If each individual emitter (or industry group) could avoid regulation by suggesting that *their* emissions are insignificant, the Good Neighbor Plan would suffer death by a thousand cuts, and Congress's program to address interstate pollution would be a dead letter.  *See Wisconsin*, 938 F.3d at 322 (rejecting argument that lesser emission reductions for a given state rendered a Good Neighbor rule "unlawful"); *Michigan v. EPA*, 213 F.3d 663, 684 (D.C. Cir. 2000) ("[S]ignificant contribution may disappear if emissions activity is sliced too thinly.").

None of Petitioner's arguments tilt the balance of equities in its favor.  First, Petitioner claims a stay will not affect emissions during judicial review because reductions will not occur until 2026.  Mot. at 21.  This is misleading.  EPA provided until 2026 to give industry sufficient compliance lead time, recognizing that these reductions must be required as expeditiously as practicable to comply with the statute and this Court's prior holdings.  88 Fed. Reg. at 36754-56.  A stay

21

would almost certainly delay compliance by years, further delaying relief for downwind states.  Mathias Decl. ¶¶ 19, 56–63.

Second, Petitioner theorizes a looming national security crisis brought on by the Rule.  Mot. at 21.  But Petitioner provides no support for this concern beyond the broad assertion that the steel industry, like many industries, is subject to this Rule and other EPA regulations and that it will need to take an unspecified number of "outages" for installation.  *Id.*  In fact, the final Rule's more limited coverage of only reheat furnaces and boilers in this industry, coupled with EPA's findings that pandemic-related supply-chain issues were already resolving, strongly supports EPA's conclusions that the Rule will not cause disruption.  *See* 88 Fed. Reg. at 36759-60; Mathias Decl. ¶¶ 38–41.  No grounds exist to speculate that the Rule will cause disruption to Petitioner's operations or the domestic steel supply generally.  *See* RTC at 696-97, 1064.

Third, Petitioner offers the generic point that the public has an interest in agencies abiding by federal law, which is beyond dispute.  Mot. at 22.  As explained above, *supra* at Argument I.A-E, however, EPA promulgated the Rule in accordance with all applicable laws.  The Rule therefore vindicates both the public's interest in duly promulgated federal regulations and in attaining cleaner, healthier air, as Congress mandated in the Act.

22

In sum, rather than implement emissions reductions using conventional technology that many of its competitors have already adopted, Petitioner argues that it—and the rest of the industry lacking such controls—should get to pass the burden of addressing cross-state ozone pollution off to other emitters and, ultimately, to communities in downwind states.  The public's interest in addressing "the steady stream of infiltrating pollution" in downwind states, *EME Homer City*, 572 U.S. at 496, outweighs Petitioner's purported harms, and Petitioner's solution—that the industry do nothing—is inequitable and harmful by its own terms.  Balancing the harms here weighs against a stay.

## CONCLUSION

Petitioner has not demonstrated that it is entitled to a stay pending judicial review, so the request for a stay should be denied.  In the event this Court finds any of Petitioner's contentions justified, however, the "extraordinary" remedy of a judicial stay should be granted only as to that portion of the Rule for which the stay factors have been met.


DATED: September 22, 2023          Respectfully submitted,

                                   TODD KIM
                                   Assistant Attorney General
                                   Environment & Natural Resources Division

                                   */s/ Elisabeth H. Carter*
                                   ELISABETH H. CARTER

CHLOE H. KOLMAN
ZOE PALENIK
United States Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
(202) 514-9277
chloe.kolman@usdoj.gov

*Counsel for Respondents*

OF COUNSEL:

DANIEL SCHRAMM
HALI KERR
JEANHEE HONG
Office of General Counsel
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C.  20460

24

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Opposition complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that the foregoing complies with the type-volume limitation specified in Fed. R. App. P. 27(d)(2)(A), because it contains approximately 5,197 words, excluding exempted portions, according to the count of Microsoft Word.

/s/ *Elisabeth H. Carter*
ELISABETH H. CARTER


**CERTIFICATE OF SERVICE**

I hereby certify that copies of the foregoing Opposition have been served through the Court's CM/ECF system on all registered counsel this 22nd day of September, 2023.


/s/ *Elisabeth H. Carter*
ELISABETH H. CARTER

# Exhibit 1

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

|  |  |  |
|---|---|---|
| | ) | |
| State of Utah, et al., | ) | |
| | ) | |
| _Petitioners_, | ) | |
| | ) | |
| v. | ) | No. 23-1157 (and consolidated |
| | ) | cases) |
| United States Environmental Protection | ) | |
| Agency, et al., | ) | |
| | ) | |
| _Respondents_. | ) | |
| _____ | ) | |

**DECLARATION OF SCOTT MATHIAS**

1.      I, Scott Mathias, affirm and declare that the following statements are true and correct to the best of my knowledge and belief and that they are based upon my personal knowledge, or on information contained in the records of the United States Environmental Protection Agency ("EPA" or the "Agency"), or on information supplied to me by EPA employees.

2.      I am the Director of the Air Quality Policy Division ("AQPD") within the Office of Air and Radiation ("OAR") at EPA, a position I have held since May 2020. AQPD is the division at EPA Headquarters that has primary responsibility for developing national programs, technical policies, regulations, and guidance to implement the national ambient air quality standards ("NAAQS") under the Clean Air Act ("CAA" or the "Act").

3.      As part of my duties as Director of AQPD, I oversee the development and implementation of national policies, regulations, and guidance relevant to section 110 of the CAA, 42 U.S.C. § 7410, including those developed or promulgated to implement section 110(a)(2)(D)(i)(I), known as the "good neighbor" or "interstate transport" provision, regarding air pollution that significantly contributes to nonattainment or interferes with maintenance of the NAAQS in other states. My responsibilities include ensuring consistent implementation of the interstate transport provision across the United States

1

through coordination of the substantive evaluation of state implementation plans ("SIPs") and the development of federal implementation plans ("FIPs") where necessary. I or my staff also coordinate closely with EPA's Regional offices in reviewing and acting on SIPs and addressing other issues related to NAAQS implementation.

4.      The purpose of this declaration is to address certain claims made by U.S. Steel in its motion for a stay of the Good Neighbor Plan in the D.C. Circuit Court of Appeals, with respect to the Plan's requirements for reheat furnaces and boilers at iron and steel mills. These are some of the "non-electricity generating units" ("non-EGUs"), or "industrial sources," regulated under the Plan.

5.      Unless otherwise noted, information and data presented in this declaration regarding the Good Neighbor Plan reflect the rule as signed on March 15, 2023, and do not account for potential impacts of subsequent administrative or judicial stays.[1] Due to temporary judicial stays of the predicate state plan disapproval action, the Plan is currently administratively stayed in 12 states: Alabama, Arkansas, Kentucky, Louisiana, Minnesota, Mississippi, Missouri, Nevada, Oklahoma, Texas, Utah, and West Virginia. The non-EGU requirements of the Plan are currently in effect for 10 states: California, Illinois, Indiana, Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania, and Virginia. (The Plan is also in effect for Wisconsin, but Wisconsin is not subject to the Plan's non-EGU requirements.)

## I.      The Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards.

A.      Overview of the Good Neighbor Plan

6.      Once EPA sets new or revised national ambient air quality standards ("NAAQS," or "air quality standard"), states must submit SIPs to satisfy certain Clean Air Act requirements, including the good neighbor provision, 42 U.S.C. § 7410(a)(2)(D)(i)(I). With respect to the 2015 NAAQS for ozone, EPA reviewed states' good neighbor SIPs, and it approved 24 plans, disapproved 19 plans, and partially approved / partially disapproved 2 plans. *See* 88 FR 9336 (Feb. 13, 2023). EPA separately found several states failed to submit complete plans, including Pennsylvania, Utah, and Virginia. *See* 84 FR 66612, 66613 (Dec. 5, 2019). A finding of failure to submit or disapproval of a Good Neighbor SIP imposes no

---

[1] *See* EPA Response to Judicial Stay Orders, https://www.epa.gov/csapr/epa-response-judicial-orders (last visited Aug. 9, 2023).

legal obligation on the state or sources within the state, but rather imposes a legal obligation on EPA to promulgate a FIP, at any time, within two years of the disapproval. 42 U.S.C. § 7410(c)(1).

7.    EPA Administrator Michael S. Regan signed a FIP action related to these requirements, referred to as the "Good Neighbor Plan"[2] (or the "Plan"), on March 15, 2023, to achieve emissions reductions required by the good neighbor provision with respect to the 2015 NAAQS for ozone. The Plan establishes federal requirements for qualifying power-plant sources in 22 states and certain industrial sources in 20 states, to reduce ozone pollution during the May 1-to-September 30 "ozone season" by reducing emissions of $NO_X$, which is an ozone precursor pollutant.

8.    The objective of the Plan is to eliminate the covered states' significant contribution to nonattainment and interference with maintenance of the 2015 ozone NAAQS in other states as expeditiously as practicable and in alignment with the statutory attainment schedule.

9.    With respect to industrial sources in 20 states, the Plan will prohibit those emissions that "significantly contribute" to downwind air-quality problems through emissions limitations and associated requirements for certain high-emitting units in nine non-EGU industries.[3]

10.    The nine industries, the regulated emissions unit types within them, the assumed emissions-control technologies on which the emissions limits are based, the annual costs, and the tons of ozone season emissions reductions that will be achieved are provided in Table V.C.2-1, 88 FR 36654, 36739. (Note that "Iron and Steel Mills and Ferroalloy Manufacturing" is listed twice because this industry uses boilers in addition to its other regulated emissions unit type, reheat furnaces.)

11.    These emissions limits do not require compliance until the start of the 2026 ozone season (May 1, 2026) at the earliest, and thus the Plan provides more

---

[2] Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, 88 FR 36654 (June 5, 2023). The rulemaking docket is EPA-HQ-OAR-2021-0668 and can be accessed through *www.regulations.gov*. A number of key supporting materials and additional information are available at EPA's website, Good Neighbor Plan for 2015 Ozone NAAQS, *https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs* (last visited June 5, 2023).

[3] It is a typical convention in interstate transport to use the term "significant contribution" as a shorthand to encompass both the "contribute significantly" and "interfere with maintenance" prongs of the Good Neighbor provision.

than three years for these sources to come into compliance from the date the Plan was signed and issued to the public on March 15, 2023.

12.     The emissions control strategies on which the Plan is premised are all conventional, widely used, at-the-source technologies that have been available to power plants and industrial sources for decades and for which several states have already set similar or more stringent emissions-control requirements. These control strategies are widely mandated for these types of sources in downwind areas with ozone air quality problems. *See generally* "Final Non-EGU Sectors Technical Support Document" (March 2023) (Document ID EPA-HQ-OAR-2021-0668-1110) (hereinafter "Final Non-EGU Sectors TSD").

13.     In addition, the numerical emissions limits that the Good Neighbor Plan establishes do not mandate that any source install any specific pollution control technology. Rather, sources may choose any emissions control technologies or strategies they wish so long as the relevant emissions limit is met. For a non-exhaustive list of potential $NO_X$ control measures, see Non-EGU TSD at 38 (reheat furnaces), and 68-84 (boilers). Thus, setting aside the availability of alternative emissions limits as discussed in Section III below, even the default emissions limits in the Good Neighbor Plan reserve the choice of means of compliance to sources' discretion in recognition of the variety of emissions control technologies that could be deployed. *See* 88 FR at 36835.

B.     Benefits of the Good Neighbor Plan

14.     In assisting downwind states with attaining and maintaining the 2015 ozone NAAQS, the Plan will deliver substantial public health and environmental benefits across wide swaths of the United States. EPA estimates the benefits of the Plan far exceed its anticipated costs. Like its predecessor programs, the $NO_X$ SIP Call,[4] Clean Air Interstate Rule ("CAIR"),[5] and CSAPR,[6] EPA is confident the

---

[4] "Finding of Significant Contribution and Rulemaking for Certain States in the Ozone Transport Assessment Group Region for Purposes of Reducing Regional Transport of Ozone," 63 FR 57356 (Oct. 27, 1998).

[5] "Rule to Reduce Interstate Transport of Fine Particulate Matter and Ozone (Clean Air Interstate Rule)," 70 FR 25162 (May 12, 2005).

[6] "Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals," 76 FR 48208 (Aug. 8, 2011) (generally referred to as the Cross-State Air Pollution Rule, or "CSAPR").

Plan can be implemented without disruption to domestic supply of key commodities and services such as steel, natural gas, and electricity.[7]

**Estimated Monetized Health and Climate Benefits, Compliance Costs, and Net Benefits of the Good Neighbor Plan, 2023 Through 2042 (Millions 2016$, Discounted to 2023)[8]**

|  |  | 3% Discount Rate | 7% Discount Rate |
|---|---|---|---|
| **Present Value** | Health Benefits | $200,000 | $130,000 |
|  | Climate Benefits | $15,000 | $15,000 |
|  | Compliance Costs | $14,000 | $9,400 |
|  | **Net Benefits** | **$200,000** | **$140,000** |
| **Equivalent Annualized Value** | Health Benefits | $13,000 | $12,000 |
|  | Climate Benefits | $970 | $970 |
|  | Compliance Costs | $910 | $770 |
|  | **Net Benefits** | **$13,000** | **$12,000** |

The estimated annualized compliance costs for the Plan of $910 million (3% discount rate, 2016$) or $770 million (7% discount rate, 2016$) are comparable to or less than those prior interstate transport rulemakings. For example, EPA estimated that the $NO_X$ SIP Call would cost $1.7 billion (1990$) annually to implement. 63 FR at 57478. Similarly, CAIR was estimated to cost the power sector $2.4 billion in 2010 and $3.4 billion in 2015 (1999$). 70 FR at 25305.

---

[7] *See* Regulatory Impact Analysis, EPA-452/R-23-001 (March 2023), at 158-68, 169-72, 266, *available at* https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs. *See also* paragraphs 38-41 below.

[8] Adapted from Good Neighbor Plan Executive Summary. For explanations, caveats, and table notes associated with these figures, see 88 FR 36654, 36666.

CSAPR was estimated to cost the power sector $810 million in 2014 (2007$). 76 FR at 48215.

15.    The Plan will deliver substantial public health and environmental benefits, including reductions in mortality and morbidity associated with emissions from power plants and non-EGUs like steel mills.[9] On average, the ozone levels at the identified "receptor" locations around the country are projected to decrease by 0.66 parts per billion (ppb). Good Neighbor Plan, 88 FR at 36748, Table V.D.3-1. The Plan will help many downwind areas make progress toward coming into compliance with the 2015 ozone NAAQS.

16.    There are 43 air quality monitoring sites throughout the United States that are identified as "receptors"—i.e., locations that are projected to struggle to attain or maintain the 2015 ozone NAAQS. *See* 88 FR at 36706-08. The combined population of the designated ozone nonattainment areas associated with these receptors in 2021 is 82.3 million people, representing roughly 25 percent of the total U.S. population.

17.    The air quality benefits of the Plan will also reach many other people beyond the specific areas where receptor sites are located. The map below graphically illustrates the reduction in ozone levels projected to occur across the United States with full implementation of the Plan.

---

[9] *See* Regulatory Impact Analysis, EPA-452/R-23-001 (March 2023), at 215-16 (Tbl. 5-3), *available at* https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs.



Impact on Top 10 Day Average MDA8 Ozone of the Final FIP Emissions Reductions in 2026

data = [8]2026gf_cntl_ussa_apca.tagged.O3NV.12US2.camx.O3_8hrmax_LST.5-9.top10avg.ioapi

18.    The emissions control strategies on which the Plan is premised are all conventional, widely-used, at-the-source technologies that have been available to power plants and industrial sources for decades. This level of control is widely mandated for these types of sources in downwind areas with ozone air quality problems. For example, low-$NO_X$ burner (LNB) combustion-control technology is widely in use across multiple industries, and according to EPA's data is already installed at thirty-two reheat furnaces in the iron and steel industry. 88 FR at 36827 (citing Final Non-EGU Sectors TSD, Section 4.). At least eight of those are located in Indiana, where U.S. Steel's Gary Works facility is located. 88 FR at 36828, fn. 388.

19.    A delay in the implementation of the Plan would result in the continuation of significant contribution to harmful levels of air pollution across the United States. Delays of as long as three years in the implementation of two prior good neighbor rulemakings ($NO_X$ SIP Call and CSAPR) have been experienced as a result of stay litigation. In both cases, the regulations were largely upheld once courts were able to adjudicate the merits. EPA is applying this same, now-Supreme Court-upheld analytical framework in this Plan. A delay of three years or more here would delay the full elimination of significant contribution under this Plan until 2029 or later. This would be eight years after the 2021 Marginal area

7

attainment deadline, five years after the 2024 Moderate area attainment deadline, and two years after the 2027 Serious area attainment deadline. In the meantime, many Americans could suffer illness and premature death from the harmful pollution that would be allowed to continue, while downwind areas that fail to attain the health-based NAAQS will be subject to ever more stringent regulatory requirements under the Act without relief from the contributing effects of upwind-state pollution. For example, the forgone emissions reductions in 2026 could result in forgone reductions in avoided premature mortalities and illnesses valued at as much as $14 billion (2016$, 3% discount rate) in 2026. Good Neighbor Plan, 88 FR at 36851.

## II.     Achievability and Cost-Effectiveness of the Plan's Requirements for Reheat Furnaces and Boilers at Iron and Steel facilities

20.     Producing steel is an energy-intensive process that generally requires significant energy, often achieved by burning large amounts of fossil fuels. As such, this industry has high $NO_X$ emissions and was therefore a natural focus of attention in identifying potential emissions-reduction opportunities to address upwind states' significant contribution to nonattainment and interference with maintenance of the 2015 ozone NAAQS. *See* Technical Memorandum, "Screening Assessment of Potential Emissions Reductions, Air Quality Impacts, and Costs from Non-EGU Emissions Units for 2026" (Feb. 28, 2022) (Document ID EPA-HQ-OAR-2021-0668-0150).

21.     EPA proposed a relatively wide-ranging set of emissions control requirements on this industry in the proposal, reflecting available information and literature on potential emissions-control opportunities. 87 FR 20036, 20145.

22.     However, EPA received many comments from this industry identifying concerns with many of the proposed analytical findings and assumptions that EPA had applied in developing the proposed rule. 88 FR at 36827.

23.     EPA carefully reviewed these concerns, and ultimately determined that, while many of the emissions control technologies it had identified could be viable for this industry, it did not have a sufficient record to confidently conclude that these emissions control strategies were sufficiently demonstrated and cost-effective on an industry-wide basis to mandate emissions limits based on those strategies in the final Plan. *Id.* (citing Final Non-EGU Sectors TSD, Section 4).

24.     EPA did not hear these same concerns when it came to LNB combustion control technologies for reheat furnaces in this industry, nor did industry commenters establish that emissions control technologies on boilers in this industry were undemonstrated, unavailable, or otherwise not cost-effective. *Id.*

25.     Although EPA recognized that it was appropriate not to finalize its proposed controls for many of the unit types in this industry, the final record established that there clearly were cost-effective emissions reductions to be obtained from reheat furnaces and boilers through the application of conventional and demonstrated $NO_X$-control technologies. *Id.* (citing Final Non-EGU Sectors TSD, Section 4).

26.     EPA estimated that the installation of LNB technology on reheat furnaces could generally achieve upwards of a 50% reduction in $NO_X$ emissions from baseline levels with potential reduction rates as high as 98%. "Technical Support Document for the Proposed Rule: Non-EGU Sectors TSD" at 31–34, 41, 43 (December 2021) (Document ID EPA-HQ-OAR-2021-0668-0145) (hereinafter "Proposal Non-EGU TSD").

27.     EPA used technical literature to inform its database of emissions controls to estimate a representative cost-per-ton for implementation of this technology, estimated at $3,656 (2016$). Technical Memorandum, "Summary of Final Rule Applicability Criteria and Emissions Limits for Non-EGU Emissions Units, Assumed Control Technologies for Meeting the Final Emissions Limits, and Estimated Emissions Units, Emissions Reductions, and Costs," at 7, 10, tbl. 6 (March 15, 2023) (Document ID EPA-HQ-OAR-2021-0668-0956).

28.     EPA also found that this technology was demonstrated for these unit types. EPA found that 32 reheat furnaces already have LNB technology installed. 88 FR at 36827; Final Non-EGU Sectors TSD at 38.

29.     Among other things, EPA observed that the Indiana Department of Environmental Management had set a limit of 0.077 lb/MMBtu for a reheat furnace at the NLMK facility based on LNB/ultra-LNB technology. Final Non-EGU Sectors TSD at 39. And EPA found that at least eight reheat furnaces in Indiana alone, where the Gary Works facility is located, have LNB technology installed. 88 FR at 36828 fn. 388.

30.     EPA had proposed a numerical emissions limit of 0.05 lb/MMBtu for reheat furnaces. But EPA listened to steel-industry commenters regarding whether

a single numerical emissions limit would be appropriate to set for reheat furnaces based on application of LNB technology. 88 FR at 36828. Commenters, such as U.S. Steel, argued that given the variability in unit configuration and operation, a single numerical emissions limit would not be appropriate or necessarily achievable at all sources. U.S. Steel Comment letter, at 91-92 (Document ID EPA-HQ-OAR-2021-0668-0798).

31.     Thus, U.S. Steel advocated for a case-by-case approach to setting a numerical emissions-rate limit. *Id.*

32.     A way to do this is through what is sometimes referred to as a "test-and-set" approach. In a test-and-set approach, a source would work with a regulator (here, the EPA) to evaluate what emissions rate a control technology could achieve at a particular unit, and then set an emissions limit based on that demonstrated rate. 88 FR at 36827-28.

33.     EPA acknowledged commenters' concern and decided to adopt a test-and-set approach for reheat furnaces, using as a model a regional haze FIP that U.S. Steel had previously supported. *See* 81 FR 21671, 21678-79 (April 12, 2016); EPA-R05-2015-0196-0112 (U.S. Steel's comment letter). EPA finalized a "test-and-set" approach so that an appropriate emissions limit is established for each reheat furnace in light of its unique circumstances, assuming the application of a well-demonstrated $NO_X$-control technology, LNB. 88 FR at 36818, 36827-28.

34.     Under this approach, sources still have the flexibility to use a technology other than LNB, if it can be demonstrated to achieve an equivalent level of reduction. 40 CFR 52.43(d)(1).

35.     The 40% reduction target is a somewhat conservative performance estimate based on a review of documentation of what LNBs have been able to achieve in practice. Proposal Non-EGU TSD at 43. EPA reached the 40% figure by analyzing the range of emissions reductions achieved by LNBs at reheat furnaces. *Id.* at 31-34, 41, 43. EPA's analysis led it to conclude that LNBs on reheat furnaces could generally achieve a reduction of 66%, with potential reduction rates as high as 98%.  *Id.*; "Response to Public Comments on Proposed Rule," at 747-48 (Document ID EPA-HQ-OAR-2021-0668-1127) (hereinafter "RTC"). EPA conservatively set the requirement at 40%, *see* 88 FR at 36828; Final Rule Non-EGU TSD at 38. However, if this reduction amount is demonstrated not to be achievable at a particular unit, operators may seek an alternative limit. (See paragraphs 45-49 below regarding alternative emissions limits.)

36.     The work that is expected in the next year for facilities with reheat furnaces is the development of a work plan, which is due August 5, 2024. 40 CFR 52.43(d)(1). Assuming facilities elect to install LNB, EPA found the time for actual installation of the LNB is estimated at 9-15 months (inclusive of design and permitting). "Non-EGU Control Installation Timing Report," at 25 (Document ID EPA-HQ-OAR-2021-0668-1077) (hereinafter "Timing Report").

37.     U.S. Steel does not present any information regarding the achievability or cost-effectiveness of $NO_X$ control technologies on boilers at any of its facilities. However, in regard to the claim that U.S. Steel or others could not prepare for compliance based on the proposed rule if the final Rule significantly changed from proposal (*see* U.S. Steel Motion at 6), EPA determined that the necessary time for compliance is available based on the date of finalization of the Rule, not the date of the proposal. *See* 88 FR at 36755, 36758-59. *See also* Timing Report at ES-2-ES-3. And EPA made available compliance extensions even from that date, if they prove to be needed, see Section III below.

38.     In the final Plan, EPA carefully evaluated concerns regarding supply-chain delays and the potential for economic disruption that might be caused by the Rule. In the report on control installation timing that EPA commissioned, researchers found that supply-chain issues caused by the COVID-19 pandemic and other factors were "ameliorating." Timing Report at 48; *see also* 88 FR at 36759-60; RTC at 1064.

39.     In particular, the Timing Report found that as of 2022: business inventories were on the upswing; the number of containerships awaiting berths was slowly declining; interstate freight and goods shipping exceeded pre-pandemic levels; the RSM US Supply Chain Index had normalized; and the Federal Reserve Bank of New York's global supply chain index was approaching normal levels. Timing Report at 48-54.

40.     The Timing Report did not identify LNB technology as facing any unique labor or supply constraints. To the contrary, relevant U.S. manufacturing indexes suggested that capacity utilization in relevant sectors like metal fabrication, machinery, and construction were roughly at long-term average levels. Timing Report at 54-56.

41.     During the rulemaking, EPA was not provided with any evidence that the Rule posed a threat to national security or economic productivity due to any

alleged disruption to steel supply. *See* RTC at 696-97, 1064. Commenters raising such concerns in this industry were reacting to the scope of the *proposed* rule, but for iron and steel, the requirements in the final Rule were substantially pared back from what EPA had proposed. The far more limited emissions-control requirements that EPA actually finalized for this industry are not anticipated to create challenges to the domestic supply of steel, in particular given that the control requirements are based on well-demonstrated technologies that are already in use at many facilities and do not impose any inherent constraints on production. *See* 88 FR at 36760.

## III.    Compliance Flexibilities Available for Industrial Sources

42.    EPA recognized that while the emissions-control requirements it set for industrial sources in the Plan were generally expected to be achievable and implementable by the 2026 ozone season, not all facilities may be able to meet the requirements. 88 FR at 36758-60, 36818-19.

43.    Thus, the requirements in the Plan that apply to industrial sources include numerous changes from the proposal that EPA developed in response to concerns raised by commenters about the costs of controls and the time needed to install controls on industrial sources. These provisions bear directly on U.S. Steel's claims of monetary and non-monetary harm.

44.    EPA has met with and will continue to meet with industry representatives to answer questions regarding the requirements for industrial sources and the process for using the Plan's compliance flexibility mechanisms. We intend to issue within several weeks a set of implementation tools that will provide further direction to aid sources in navigating this process.

45.    Two regulatory provisions in the Plan may be of potential relevance to the circumstances described by U.S. Steel at its Gary Works facility, though EPA does not at this time determine whether they would qualify for either of these flexibilities.

46.    First, under 40 CFR § 52.40(e), the owner or operator of an affected unit that "cannot comply with the applicable requirements in [the Federal Plan] due to technical impossibility or extreme economic hardship may submit to the

Administrator," within 425 days after the date the Plan publishes in the Federal Register, a request for approval of a "case-by-case emissions limit."[10]

47.    If EPA determines that the request contains information sufficient to confirm that the affected unit is unable to comply with the applicable emissions limit due to technical impossibility or extreme economic hardship, EPA may establish an appropriate case-by-case emissions limit that applies to the affected unit in lieu of the emissions limit that would otherwise apply under the Federal Plan.[11]

48.    These provisions for establishing case-by-case emissions limits reflect EPA's recognition that there may be "unique circumstances" that "would, for a particular source, render the final emissions control requirements [of the Federal Plan] technically impossible or impossible without extreme economic hardship."[12]

49.    It is my understanding that any decision by EPA to grant or deny a request for a case-by-case emissions limit under 40 CFR § 52.40(e) would be a final action subject to judicial review under CAA § 307(b)(1).

50.    Second, under 40 CFR § 52.40(d), the owner or operator of an affected unit that cannot comply with the applicable requirements of the Federal Plan by May 1, 2026 due to "circumstances entirely beyond the owner or operator's control" may request an initial compliance extension of up to 1 year and may thereafter request a second compliance extension of up to 2 additional years (i.e., until May 1, 2029).[13] These provisions for limited compliance extensions reflect EPA's recognition that "labor shortages, supply shortages, or other circumstances beyond the control of source owner/operators may, in some cases, render compliance by 2026 impossible for a particular industrial source."

---

[10] 40 CFR § 52.40(e) (88 FR at 36871). Subparagraph (2) of 40 CFR § 52.40(e) specifies the information that the owner or operator must include in a request for a case-by-case emissions limit and subparagraphs (5) through (8) of this section specify the criteria and procedures that EPA will apply to evaluate and grant or deny such a request within a specified timeframe.

[11] 40 CFR § 52.40(e)(4).

[12] Good Neighbor Plan, 88 FR at 36818.

[13] 40 CFR § 52.40(d) (88 FR at 36870). Subparagraph (3) of 40 CFR § 52.40(d) specifies the information that the owner or operator must include in each request for a compliance extension, and subparagraphs (6) through (10) of this section specify the criteria and procedures that EPA will apply to evaluate and grant or deny such a request within a specified timeframe.

51.     It is my understanding that any decision by EPA to grant or deny a request for a compliance extension under 40 CFR § 52.40(d) would be a final action subject to judicial review under CAA § 307(b)(1).

52.     Any owner or operator of an affected unit may request both a case-by-case emissions limit and a compliance extension under the Plan.

53.     Because it is still very early in the process of implementing the Good Neighbor Plan, and the deadlines for applying for these types of relief are still months off, no sources have yet submitted an official request for relief under either provision, and EPA thus has not taken final action on any such request in accordance with the applicable procedures in 40 CFR § 52.40(d) or (e).

54.     EPA also recognized that unique aspects of particular industries or emissions unit types warranted certain additional regulatory mechanisms to ensure the implementation of the Good Neighbor Plan could go forward without imposing undue or unintended hardship on covered sources. The unit-specific "test-and-set" approach for reheat furnaces is explained above in Section II.

55.     With respect to the requirements for fossil-fuel fired boilers in several industries, including iron and steel, the Good Neighbor Plan contains several provisions to focus regulatory compliance efforts on cost-effective control measures. The rule includes an exemption for "low-use" boilers, i.e., those that operate less than 10 percent per year, in recognition that the lesser amount of emissions reductions that could be obtained from such boilers would have a smaller air quality benefit that would not justify the cost of control. See 40 CFR 52.45(b); *see also* 88 FR at 36833. And in recognition of comments explaining that boilers firing non-fossil fuels (e.g., biomass) may have greater difficulty achieving the emissions limits, EPA included a criterion that the rule applies only to boilers burning 90 percent or more of coal, residual or distillate oil, or natural gas or combinations of these fossil fuels on a heat-input basis. *See* 40 CFR 52.45(b); *see also* 88 FR at 36833-34.

## IV. The Consequences of Staying the Good Neighbor Plan

56.     Staying the Good Neighbor Plan—to any extent—is harmful to public health and the environment and will undermine the planning efforts and increase the regulatory burdens for all downwind areas that are impacted by the upwind states' emissions, with these impacts extending far beyond just those areas that were formally identified as "receptors" in EPA's modeling analysis. While U.S.

14

Steel seeks a stay of the Plan only as to the iron and steel industry, the consequences described in this section are presented at the program level.[14]

57.     By far the most concerning consequence of a stay is the effect on the downwind areas in other states that face continuing violating ozone levels and ratcheting, mandatory ozone-nonattainment requirements. Beyond the continuing harm to public health that ozone levels above the NAAQS signify, the failure to eliminate upwind states' significant contribution under the Good Neighbor Provision is also contributing to downwind areas' increased regulatory burdens under the Act, and a stay impacting EPA's ability to implement the Good Neighbor Plan will exacerbate the consequences of this already-delayed implementation.[15]

58.     Emissions from the 23 upwind states covered by the Good Neighbor Plan were found by EPA to significantly contribute to unhealthy ozone levels at receptors in designated ozone nonattainment areas across the country. These areas include: Phoenix-Mesa, AZ; Yuma, AZ; the Morongo Band of Mission Indians, CA; the Pechanga Reservation, CA; Denver Metro/North Front Range, CO; Greater Connecticut, CT; Chicago, IL-IN-WI; New York-Northern New Jersey-Long Island, NY-NJ-CT; Allegan, MI; Muskegon, MI; Las Vegas, NV; Cleveland, OH; Dallas-Fort Worth, TX; El Paso-Las Cruces, TX-NM; Houston-Galveston-Brazoria, TX; San Antonio, TX; Northern Wasatch Front, UT; Milwaukee, WI; Sheboygan, WI.[16] Most of these areas are now classified as Moderate nonattainment of the 2015 ozone NAAQS.[17] Downwind-state obligations to attain the NAAQS for most of these areas are therefore driven by the statutory attainment

---

[14] EPA's analysis in the final Plan indicates that iron and steel facilities potentially subject to the Rule are located in at least five states for which the Plan's requirements are currently in effect: Indiana, New York, Ohio, Pennsylvania, and Virginia. See Technical Memorandum, "Summary of Final Rule Applicability Criteria and Emissions Limits," at 12-14, Tbl. 9 (Document ID EPA-HQ-OAR-2021-0668-0956).

[15] In *Maryland v. EPA*, 958 F.3d 1185, the D.C. Circuit held that states and EPA are obligated to eliminate significant contribution under the Good Neighbor Provision for the 2015 ozone NAAQS no later than the Marginal area attainment date, which fell on August 3, 2021. Thus, 2020 should have been the relevant year for analysis and, to the extent possible, elimination of significant contribution. *See* Final Rule, 88 FR 9336, 9340-41 (discussing EPA's interpretation of the *Maryland* holding).

[16] Air Quality Modeling Final Rule TSD, Appendix C, *available at* https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs.

[17] EPA Green Book, 8-Hour Ozone (2015) Nonattainment Areas (data current as of July 31, 2023), https://www3.epa.gov/airquality/greenbook/jnc.html. The Morongo Band of Mission Indians is in Serious nonattainment. El Paso-Las Cruces, TX-NM and Yuma, AZ are in Marginal nonattainment.

date of August 3, 2024, for Moderate areas. Areas that fail to attain by that date will be reclassified (or "bumped up") to Serious nonattainment, indicating persistent unhealthy air and triggering even greater regulatory obligations. *See* 42 U.S.C. §§ 7511(b)(2), 7511a(c).

59.     Because attainment is determined using an average of the three prior calendar years' monitoring data, the last year that air quality data may impact whether nonattainment areas are found to have attained by the 2024 Moderate attainment date is 2023. Thus, the objective of the Plan is to obtain emissions reductions from power plants that EPA found were achievable using existing, installed control technology in 2023 to improve ozone levels in downwind areas through eliminating, to the extent possible, the upwind states' "significant contribution" by this year. The Plan seeks further reductions from power plants and industrial sources by 2026, which similarly corresponds to the Serious area attainment date in 2027. This aspect of the Plan's design was done to comply with judicial holdings in *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019) and *Maryland v. EPA*, 958 F.3d 1185 (D.C. Cir. 2020), among others. *See* Good Neighbor Plan, 88 FR at 36754-58.

60.     Nonattainment areas that had been classified originally as Marginal nonattainment have already faced one attainment deadline under the 2015 ozone NAAQS with no relief from the significant contribution of upwind states. Under the Clean Air Act, Marginal areas that failed to attain by the August 3, 2021, attainment date were mandatorily reclassified to Moderate nonattainment, making their respective states subject to a January 1, 2023, deadline to submit revised ozone SIPs and, by that same date, to implement, among other requirements, reasonably available control measures (RACM) and reasonably available control technology (RACT). *See* 87 FR 60897, 60900 (Oct. 7, 2022).[18]

61.     This schedule for downwind areas is driven by the statute at §§ 7511 and 7511a, as well as EPA's implementation regulations, 40 CFR 51.1312(a)(3)(i). These regulations established a RACT implementation deadline for areas initially classified Moderate as no later than January 1, 2023. The need for emissions reductions in 2023 is also informed by the modeling and attainment demonstration requirements in 40 CFR 51.1308(d), which require a downwind state to provide for

---

[18] Other substantial requirements are triggered by the Moderate classification, including: making an attainment demonstration, implementing reasonable further progress (RFP) emissions reduction requirements, establishing a motor vehicle inspection and maintenance program, and complying with a higher emissions offset ratio before new major sources can be permitted to construct. *See generally* 42 U.S.C. § 7511a(b).

implementation of all control measures needed for attainment no later than the beginning of the attainment year ozone season (i.e., 2023).

62.     If EPA determines that these nonattainment areas fail to attain the 2015 ozone NAAQS based on the monitoring data for the 2021-2023 period, they will be reclassified to Serious nonattainment unless eligible for 1-year attainment date extensions (*see* 42 U.S.C. § 7511(a)(5)), meaning a cascade of additional, statutorily mandated requirements would be triggered on top of the requirements already mandated for Moderate areas. *See generally* 42 U.S.C. § 7511a(c). Among other things, the application of RACT on existing sources and major new source permitting requirements begins to apply to sources half the size of those subject to these requirements at lesser ozone-nonattainment classifications (i.e., sources with the potential to emit just 50 tons per year of ozone precursors, rather than 100 tons per year). *Id.*; 42 U.S.C. § 7511a(f)(1).[19]

63.     These ratcheting statutory requirements have obvious implications for industrial expansion, economic development, and tax base in nonattainment areas. Meanwhile, with no Good Neighbor requirements in place, an upwind state's existing sources may continue to emit at levels that are significantly contributing to the downwind area's ozone violations, even when cost-effective emissions control measures for those sources have been found to be available.

64.     Finally, areas that stand to benefit from and which are relying upon the air quality improvements of the Good Neighbor Plan extend beyond just those "receptor" areas that were identified in EPA's modeling. Areas throughout the country were reclassified to Moderate nonattainment in EPA's October 2022 action (see paragraph 60), including cities such as Baltimore, Cincinnati, Louisville, Philadelphia, St. Louis, and Washington, DC. *See* 87 FR at 60899 (Table 1) (listing all areas that failed to attain). EPA and state air planning agencies had counted on taking the air quality benefits of the Good Neighbor Plan into account in numerous regulatory actions associated with these areas. Indeed, actions have already been planned or have been taken that rely on the air quality benefits of the Good Neighbor Plan, assuming it would take effect in 2023. *See, e.g.,* Air

---

[19] Accounting for the fact that certain areas are already in Serious or Severe nonattainment for the 2008 ozone NAAQS, these requirements would not newly impact Dallas-Fort Worth, Denver/Front Range, Houston-Galveston-Brazoria, Morongo Band, New York-New Jersey-Long Island, or the Greater Connecticut nonattainment areas. EPA Green Book, 8-Hour Ozone (2008) Nonattainment Areas (data current as of July 31, 2023), https://www3.epa.gov/airquality/greenbook/hnc.html.

Plan Approval; Michigan; Redesignation of the Detroit MI Area to Attainment for the 2015 Ozone Standards, 88 FR 32594, 32605 (May 19, 2023).

65.     The nationwide improvement in ozone levels from the Plan (see paragraph 17) thus provides both health and regulatory-relief benefits to both upwind and downwind states across a wide swath of the country. Staying the Good Neighbor Plan disrupts the planning of both EPA and state air agencies, shifts the regulatory compliance burden to the emissions sources in downwind areas, and frustrates the fundamental purpose of the Act to expeditiously meet and maintain the nation's air quality standards.

SO DECLARED:

Scott Mathias, Director
Air Quality Policy Division

DATED:  September 22, 2023

18